**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Richard Manriquez,

               Plaintiff,

v.

Town of Superior, et al.,

               Defendants.

No. CV-18-02026-PHX-DWL

**ORDER**

Pending before the Court is a motion for summary judgment filed by Defendants Joel Ensley, Bryan Lawrence, Richard Mueller, and Anthony Doran (collectively, "Defendants"). (Doc. 65.) They argue that (1) Plaintiff Richard Manriquez's 42 U.S.C. § 1983 claims for excessive force and an illegal search are barred by *Heck v. Humphrey*, 512 U.S. 477 (1994), (2) they are entitled to qualified immunity, and (3) Manriquez has failed to properly support some of his claims for damages. For the following reasons, the motion will be granted in part and denied in part.

## BACKGROUND

I.   <u>Factual Background</u>

    A.    **The Search Of The Motel Room**

At the time of the events in question, Defendants were all police officers employed by the Town of Superior (the "Town"). On August 20, 2016, Lawrence pulled over a truck occupied by non-party John Ray Soriano and another non-party. (Doc. 76-1 at 29.) Lawrence performed an outside sweep of the vehicle with his police dog, Ace, who alerted

to the possible presence of drugs.  (*Id.*)  This led Lawrence, with the assistance of Ensley and several other officers, to search the car.  (*Id.*)  The search revealed a .22 caliber pistol, a small quantity of marijuana, and what Lawrence identified as a meth pipe.  (*Id.*)  The officers arrested Soriano and the other occupant.  (*Id.*)

When the officers searched Soriano incident to his arrest, they discovered a key to a room at the Copper Mountain Motel.  (*Id.* at 36.)  Soriano had been the target of several months' worth of investigations into "the sale of dangerous drugs," with "numerous contacts" made in the area of the Copper Mountain Motel that led to drug-related arrests.  (*Id.* at 31.)  With the discovery of the room key, the officers decided to obtain a search warrant for Soriano's motel room.  (*Id.*)

Ensley prepared an affidavit in support of the search warrant, which he obtained telephonically from a justice of the peace.  (Doc. 76-1 at 41-43 [affidavit].)  The resulting warrant provided:

> Proof by affidavit having been made . . . by Officer C. Ensley . . . , I am satisfied that there is probable cause to believe that . . . on the premises known as: 577 W. Kiser Room #1 Superior AZ 85173, known as the Copper Mountain Motel . . . there is now [evidence of drug trafficking]. . . .  YOU ARE THEREFORE COMMANDED . . . to make a search of the above named . . . premises.

(*Id.* at 45-46.)

At around 9:45 p.m., Defendants searched Soriano's motel room pursuant to the warrant.  (*Id.* at 36.)  Inside, they found four individuals, who they detained while searching the room.  (*Id.*)  This search turned up several small quantities of marijuana, a "shard" of meth, and other drug paraphernalia.  (*Id.* at 36-37.)  One of the occupants of the room claimed the drugs belonged to Soriano.  (*Id.*)  After interviewing the four occupants, and based on the results of the search, Defendants arrested three of the four.  (*Id.* at 36, 38.)

### B.   The Attempt To "Amend" The Warrant To Cover 711 W. Sonora

After the search, Ensley called the justice of the peace who had issued the search warrant.  (*Id.* at 37.)  Ensley's purpose in making this call was to obtain permission to "amend" the warrant to authorize a search at a different location—a home located at 711

W. Sonora. (*Id.*) In his initial search warrant affidavit, Ensley had described the property at 711 W. Sonora as "the primary residence of John Ray Soriano and his uncle, Richard 'Fiti' Manriquez," and had avowed that he "and his coworkers" were "extremely familiar" with it. (*Id.* at 42.) The conversation during the phone call went as follows:

> **Ensley**: Hey, this is Christian Ensley from the Superior PD. Good evening. How are you? . . . We . . . would like to amend the search warrant to include another location, which would be the . . . suspect's primary residence, which was discussed in the affidavit, which is 711 West Sonora. . . . That's what we'd like to do at this time. We – we've executed the search warrant for the primary location listed, and . . . we'd like to try the . . . other residence that was . . . articulated in the affidavit, his primary residence over on Sonora.

> **Justice Of The Peace**: All right.

> **Ensley**: Do we have your permission to amend the search warrant?

> **Justice Of The Peace**: Yeah, go ahead and amend it.

> **Ensley**: Okay. Are we – it would still serve that right now as one continuous search warrant? . . . That's okay?

> **Justice Of The Peace**: That's fine.

(Doc. 68-7 at 32-33.)[1]

The warrant itself, however, was never modified to identify 711 W. Sonora as a location that could be searched. (*Id.* at 45-46.) Instead, Defendants simply reused the original warrant as their justification for searching the home at 711 W. Sonora.

### C.   The Conflicting Accounts Of Defendants' Encounter With Manriquez

Defendants arrived at 711 W. Sonora at approximately 11:30 p.m. (*Id.* at 48.) The

---

[1]      One of the exhibits to Defendants' motion is a document entitled "Addendum for Amended Warrant." (Doc. 76-1 at 48.) This unsigned document, which states that it was prepared by Ensley, purports to identify three reasons why there was probable cause to conduct a search of 711 W. Sonora: (1) it was "a location known for drug-related traffic," (2) Ensley "had conducted several investigations involving" drugs at that location and believed that drug-related evidence of would be found there, and (3) that location was the "known residence of both Richard 'Fiti' Manriquez and his nephew, John Ray Soriano, both men believed to be involved in the sale of Dangerous Drugs." (*Id.*) None of this information, however, was conveyed to the justice of the peace at the time Ensley sought verbal permission to amend the warrant—as noted above, the transcript of Ensley's telephone call to the justice of the peace reveals that Ensley merely stated that 711 W. Sonora was Soriano's "primary residence." (Doc. 68-7 at 32-33.) Additionally, the time stamp at the top of the "Addendum" suggests it was not provided to the justice of the peace until August 26, 2016, which was six days after the search. (Doc. 76-1 at 48.)

1   parties offer diverging accounts of what happened next.

2                           1.   Defendants' Account

3       In Defendants' telling, the officers approached the home and began to knock on the

4   door.   (*Id.* at 18 [Lawrence trial testimony].)   When Manriquez opened the door,

5   Defendants announced they were police officers, informed Manriquez they had a warrant

6   to search his home, and asked him to step outside.  (*Id.* at 18-19.)  Manriquez became

7   "belligerent" and cursed at Lawrence as Lawrence reached for his arm. (*Id.* at 10-11.)

8   Manriquez then "jerked away" from Lawrence, and when Lawrence reached back to regain

9   control, they both ended up falling to the ground. (*Id.*)

10      At that point, Mueller moved to assist Lawrence in restraining Manriquez on the

11  ground out of a concern for officer safety—he believed that continuing to linger in the

12  doorway created a "fatal funnel" situation where unannounced inhabitants of the house

13  could fire upon Defendants from any angle.  (Doc. 76-2 at 9-10.)  At the same time, Ensley

14  moved to restrain Manriquez's legs.  (Doc. 76-1 at 21.)

15      Next, Defendants employed a variety of "control" techniques, which included "soft-

16  hand techniques" such as manipulation of pressure points, as well as close-handed strikes

17  to Manriquez's upper torso.  (Doc. 76-1 at 12; Doc. 76-2 at 15-16.)  A taser was also

18  deployed.  Doran wrote in a police report that the taser had an "instant effect" in stopping

19  Manriquez's resistance (Doc. 76-2 at 28), but Mueller and Manriquez both indicated the

20  taser missed (Doc. 76-2 at 12; Doc. 68-5 at 8-9.)

21      The combined efforts of Defendants eventually subdued Manriquez, who was then

22  put in handcuffs.  (Doc. 76-1 at 11-12.)  The officers noted some "bruising" and "abrasions"

23  on Manriquez (Doc. 76-2 at 17) and "paramedics were called to the scene to address [his]

24  wounds" (Doc. 76-1 at 38).

25                           2.   Manriquez's Account

26      In Manriquez's version, he was sitting on his couch when he noticed police lights

27  flashing outside his home.  (Doc. 68-5 at 28-29.)  He went to his door to "find out what's

28  going on."   (*Id.* at 29.)   He opened the interior door, and through an exterior door

Defendants informed Manriquez they had a warrant and that he was under arrest. (*Id.* at 31, 37.) After Manriquez unlocked the exterior door, Defendants swung the door open and "gang rushed" Manriquez, bringing him to the ground immediately. (*Id.* at 31-34.) Defendants then began punching Manriquez, who struggled in an attempt to dodge the incoming blows. (*Id.* at 35.) Eventually, Manriquez "just [gave] up," stopped moving, and Ensley ordered the other Defendants to stop and to place handcuffs on Manriquez. (*Id.* at 50.)

During the handcuffing sequence, Lawrence punched Manriquez once more on the forehead, manipulated his arms in a way that caused extreme pain in his shoulders, and lifted him from the floor by his now-handcuffed hands. (*Id.* at 50, 67-69, 73-74.) Ensley verbally admonished Lawrence after the punch (*id.* at 69 ["Ensley tells him [Lawrence] . . . not to do that"]) and again after the arm lift (*id.* at 73 ["I guess it was Ensley that told them, Hey, stop it already. Don't do that."]). Manriquez asserts that he was never asked to step outside and that he did nothing to provoke Defendants' violence. (*Id.* at 54-55, 58-59.)

### D.   **The Search Of 711 W. Sonora**

Once Manriquez was removed, Defendants conducted a search of his home. (Doc. 76-1 at 38.) Defendants found several torn pieces of plastic, a digital scale, and a meth pipe. (*Id.*) They also found what was described in the search warrant return as a "[g]reen note book containing ledger of drugs sales" (*id.* at 51), but this was later identified as a record of scores in a dice game (Doc. 68-2 at 6-7).

### E.   **State Court Prosecution**

In November 2016, the Pinal County Attorney's Office declined to prosecute Manriquez for any drug trafficking activity or for his conduct during Defendants' execution of the search warrant. (Doc. 68-7 at 14.)

Nevertheless, on March 29, 2017, Ensley issued a citation charging Manriquez with two misdemeanors: (1) a violation of A.R.S. § 13-2402 (obstructing governmental operations) and (2) a violation of A.R.S. § 13-3415 (possession of drug paraphernalia).

(Doc. 68-7 at 10.)  The resulting case was heard in Superior-Kearny Justice Court by the same justice of the peace who had authorized the search warrant.

Manriquez moved to exclude the evidence seized at his home, arguing that (1) the search warrant was facially invalid, (2) the warrant application lacked probable cause, and (3) Defendants had obtained the warrant through deception.  (Doc. 68-7 at 13-17, 25-29.)  The justice of the peace granted the suppression motion in an order that provides no insight into his reasoning.  (Doc. 68-8 at 2-3.)

Manriquez then moved to dismiss both charges against him.  (Doc. 68-8 at 5-7.)  Because Manriquez's motion to suppress evidence had been based, in part, on the alleged facial invalidity of the search warrant, Manriquez argued the officers were not acting with lawful authority, and thus Manriquez couldn't have been obstructing government operations.  (*Id.* at 6.)  Similarly, Manriquez argued that because the possession charge was premised on evidence that had been suppressed, the State no longer had a case.  (*Id.* at 7.)  The justice court denied the motion to dismiss as to the obstruction charge but granted it as to the possession charge.  (*Id.* at 9-10.)

The matter proceeded to a bench trial.  At trial, Lawrence testified that Manriquez became "belligerent" as soon as he reached for Manriquez's arm.  (Doc. 76-1 at 24.)  He further testified that the "belligerent behavior" of "cursing and then not stepping towards [Defendants] as [they] asked him to exit the property" led to the altercation.  (*Id.* at 25.)

Manriquez was ultimately found guilty of obstructing government operations.  (Doc. 68-8 at 12.)  The minute entry from the justice court identifies the statute underlying the conviction as A.R.S. § 13-2402(A)(1) but provides no information concerning why Manriquez was found guilty.  (*Id.*)  Manriquez didn't pursue an appeal.  (Doc. 76-2 at 37.)

II.    Procedural History

On June 27, 2018, Manriquez filed this action against Defendants and the Town.  (Doc. 1.)[2]  The complaint asserts two claims against Defendants under 42 U.S.C. § 1983—

---

[2]    This case was originally assigned to a different judge.  It was reassigned to the undersigned judge on October 31, 2018.  (Doc. 27.)

Count I is a claim for excessive force and Count II is a claim for an illegal search, both in violation of the Fourth and Fourteenth Amendments.  (*Id.* ¶¶ 87-105.)  Count III, a *Monell* claim, alleges that the Town has a "policy and/or custom of hiring substandard police officers who have extensive misconduct records at other police agencies" and fails to appropriately train those officers.  (*Id.* ¶¶ 106-117.)

On December 19, 2019, the parties filed a joint stipulation to dismiss Count III with prejudice.  (Doc. 63.)  The following day, the Court granted the stipulation.  (Doc. 64.)  That terminated the Town's involvement in this action.  (*Id.*)

On December 20, 2019, Defendants filed their motion for summary judgment.  (Doc. 65.)[3]  The motion thereafter became fully briefed (Docs. 68, 73) and, after issuing a tentative ruling (Doc. 78), the Court heard oral argument (Doc. 79).

## ANALYSIS

Defendants move for summary judgment on three grounds.  First, they assert that, because Manriquez's conviction under A.R.S. § 13-2402(A)(1) necessarily establishes that he used or threatened to use violence or physical force and that he impaired the performance of governmental activities lawfully performed by government actors, his § 1983 claims are barred by *Heck v. Humphrey*.  (Doc. 65 at 6.)  Second, and alternatively, Defendants argue they are entitled to qualified immunity on both of Manriquez's claims.  (*Id.* at 6-16.)  Third, Defendants argue that Manriquez is unable to demonstrate causation for his shoulder injuries because he doesn't have "an admissible medical expert on causation."  (*Id.* at 16-18.)

I.  <u>Legal Standard</u>

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits,

---

[3]     The Court identified information in Defendants' exhibits that should have been redacted pursuant to Federal Rule of Civil Procedure 5.2(a).  (Doc. 75.)  As a result, those exhibits were sealed and Defendants later filed redacted, unsealed versions of their exhibits.  (Doc. 76.)

if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"Summary judgment is appropriate when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $ 446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459. Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

II. *Heck* Doctrine

Under *Heck v. Humphrey*, a claim for damages "for allegedly unconstitutional . . . actions whose unlawfulness would render a conviction or sentence invalid . . . . is not cognizable under § 1983." 512 U.S. at 487. Thus, "[w]hen a plaintiff who has been convicted of a crime under state law seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Hooper v. Cty. of San Diego*, 629 F.3d 1127, 1130 (9th Cir.

2011) (internal quotation marks and citation omitted).  If so, the suit is barred.  *Id.*  Defendants bear the burden of demonstrating that Manriquez's success on his § 1983 claims would necessarily imply the invalidity of his state-court conviction.  *See, e.g., Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1046 (9th Cir. 2018) (holding that *Heck* didn't bar plaintiff's § 1983 claims because "Defendants have not demonstrated that Reese's claims in this action are barred by *Heck*"); *Jarboe v. Cty. of Orange*, 293 Fed. App'x 520, 521 (9th Cir. 2008) ("[W]here the defendant relies on *Heck*, he has the burden of proving that the plaintiff's success will necessarily imply the invalidity of the plaintiff's underlying conviction.").

A.    **Count I: Excessive Force**

Before turning to the *Heck* ramifications of Manriquez's conviction, it's important to provide some background information concerning Arizona law.  Manriquez was found guilty of violating A.R.S. § 13-2402(A)(1), which prohibits "using or threatening to use violence or physical force" to knowingly obstruct, hinder, or impair "[t]he performance of a governmental function by a public servant acting under color of his official authority."  Notably, subsection B of § 13-2402 states "[t]his section does not apply to the obstruction, impairment, or hinderance of the making of an arrest."  That crime, resisting arrest, is governed by a different statute, A.R.S. § 13-2508.  Finally, A.R.S. § 13-3881(B) prohibits the use of "unnecessary or unreasonable force . . . in making an arrest" and A.R.S. § 13-404(B)(2) allows a justification defense to resisting arrest if "the physical force used by the peace officer exceeds that allowed by law."

Turning to the application of *Heck*, Defendants argue that, because § 13-404 provides for a justification defense and § 13-3881 makes an excessively forceful arrest unlawful, Manriquez's conviction necessarily involved a finding that the officers didn't use excessive force and that Manriquez wasn't justified in resisting arrest.  (Doc. 73 at 5-6.)  The trouble with that argument is that §§ 13-404 and 13-3881 apply to arrests.  Section 13-2402, the statute under which Manriquez was convicted, specifically does *not* apply to arrests.  Thus, although there's a strong argument that a conviction for resisting arrest under

§ 13-2508 would necessarily imply a finding that the officers did not use excessive force, Defendants have not shown that the crime of obstructing government operations under § 13-2402(A)(1) requires the same conclusion.  Put another way, the fact of Manriquez's conviction under § 13-2402(A)(1) doesn't necessarily show that the officers used an appropriate level of force.

The trial testimony leading to Manriquez's conviction underscores this point. Lawrence indicated that Defendants' use of force was premised on Manriquez's belligerent behavior when resisting the execution of the search warrant.  (Doc. 76-1 at 6-27.) Specifically, Lawrence testified that Manriquez's became "belligerent" when he "did not comply" with an order to exit his home.  (*Id.* at 25, 27.)  That verbal order accompanied Lawrence's announcement that he had a search warrant and came at the same time Lawrence reached for Manriquez in order to remove him from his home.  (*Id.* at 23-24.) In other words, the conduct that Lawrence described in his trial testimony, and the evidence underlying Manriquez's conviction, was resistance to the execution of a search warrant, not resistance to arrest.  *Cf. Lockett v. Ericson*, 656 F.3d 892, 896-97 (9th Cir. 2011) (indicating that courts examine the evidence introduced at trial when applying *Heck*); *Sanford v. Motts*, 258 F.3d 1117, 1119-20 (9th Cir. 2001) (indicating that the acts upon which a conviction are based are a key component of the *Heck* analysis).  Defendants themselves recognize that Manriquez's conviction was based not on resisting arrest, but "on his physical response to the search warrant execution."  (Doc. 65 at 5.)

Because Manriquez wasn't convicted of resisting arrest, this case is distinguishable from *Cunningham v. Gates*, 312 F.3d 1148 (9th Cir. 2002), which is the primary case on which Defendants rely.  In *Cunningham,* the Ninth Circuit found a claim *Heck*-barred because success on the claim would have "necessarily impl[ied] [the police] were not acting within the scope of their duties" when they returned fire on two individuals who began the altercation by shooting at them.  *Id.* at 1154-55.  This would have conflicted with the plaintiff's conviction because the jury that delivered that conviction "could not have convicted [the plaintiff] for attempted murder unless the jury concluded that at the moment

[plaintiff] fired on the SIS officers, he knew or should have known that they were police officers acting within the scope of their duties." *Id.* at 1154.  In other words, a necessary predicate of the plaintiff's state-court conviction was that that the officers were acting with reasonable force. *Id.* at 1155.  But as discussed above, § 13-2402 doesn't require a finding that Manriquez was unjustified in resisting or that the officers acted with appropriate force—those requirements apply to a separate crime of which Manriquez was neither convicted nor charged.

To be sure, a necessary element of Manriquez's conviction is that he "us[ed] or threaten[ed] to use violence or physical force." A.R.S. § 13-2402(A)(1).  But "a plaintiff alleging excessive force does not collaterally attack his conviction or deny that he resisted.  Rather, [such a] plaintiff claims that he suffered unnecessary injuries because the response to his resistance was not objectively reasonable."  *Hooper*, 629 F.3d at 1133 (quoting *VanGilder v. Baker*, 435 F.3d 689, 692 (7th Cir. 2006)) (internal quotation marks and alterations omitted).  Were the rule otherwise, "it would imply that once a person resists law enforcement, he has invited police to inflict any reaction or retribution they choose, while forfeiting the right to sue for damages. . . .  This would open the door to undesirable behavior and gut a large share of the protections provided by § 1983."  *VanGilder*, 435 F.3d at 692.

The upshot of all this is that, although Manriquez may not deny that he used or threatened to use violence or physical force, his excessive force claim still may proceed under *Heck*.  The justice court could have found Manriquez guilty of violating A.R.S. § 13-2402(A)(1) without concluding that Defendants used a reasonable level of force.  Thus, Manriquez's conviction wouldn't necessarily be invalidated by a finding in this action that Defendants violated the Fourth Amendment by using unreasonable force.

### B.    Count II: Illegal Search

Defendants argue that Manriquez's conviction also bars Count II, the illegal search claim, because § 13-2404(A)(1) requires that officers be "engaged in a *lawful* government operation."  (Doc. 65 at 6, emphasis added; *see also* Doc. 73 at 7-8 [same].)

This argument lacks merit.  By its terms, § 13-2402(A)(1) has no requirement that a public servant be engaged in the "lawful" exercise of government authority.  Instead, it requires that an official be "acting under *color* of his official authority."  A.R.S. § 13-2402(A)(1) (emphasis added).

In Arizona, an officer acts under the color of his authority when executing a search warrant.  *State v. Clary*, 2 P.3d 1255, 1258 (Ariz. Ct. App. 2002) (citing A.R.S. § 13-2402 for the proposition that it is a crime to resist a search warrant and parenthetically noting that such resistance would constitute obstruction of a public servant acting under color of his official authority).  Critically, it is a crime to resist a search warrant regardless of the warrant's ultimate legality: "There is . . . no right to resist a search warrant later found to be illegal."  *State v. Hatton*, 568 P.2d 1040, 1046 (Ariz. 1977).  Thus, under § 13-2402, it is a crime to resist *any* warrant, not just those that are lawful.

This forecloses Defendants' argument that a successful outcome on Count II, Manriquez's illegal search claim, would necessarily undermine his conviction under § 13-2402(A)(1).  That conviction didn't rest on an implied determination that the underlying search was lawful.  Indeed, the justice court granted Manriquez's pretrial motion to suppress the evidence found in 711 W. Sonora.  Thus, at most, Manriquez's conviction rested on an implied determination that Defendants were acting under "color of" their authority when they were executing the warrant.  That is an element that Manriquez would have to prove (not refute) to succeed on Count II—he must show that Defendants were acting under "color of" state law.  *See* 42 U.S.C. § 1983.

Defendants' remaining arguments are unconvincing.  They cite *New Jersey v. Camillo*, 887 A.2d 1151, 1153 (N.J. Super. App. Div. 2005), for the proposition that the purpose of § 13-2402 is to "prohibit a broad range of behavior designed to impede or defeat the lawful operation of government."  Defendants don't explain why a New Jersey court's interpretation of a New Jersey law has any bearing on the interpretation of Arizona statutes, let alone how it advances a position more persuasive than interpretations advanced by Arizona's own courts.  Further, Defendants' cited language was neither part of the statute

at issue nor the court's interpretation of that statute—it was a declaration of statutory purpose from a report issued by the New Jersey Criminal Law Revision Committee. *Camillo*, 887 A.2d at 1153.  Defendants have pointed to no similar declaration from the Arizona legislature.

Defendants also cite *State v. Snodgrass*, 570 P.2d 1280 (Ariz. Ct. App. 1977), for the proposition that an "obstruction conviction requires police to be in lawful performance of duties."  (Doc. 73 at 7.)  But *Snodgrass* addressed whether the phrase "in the performance of his duty," which appeared in a different statute (the since-repealed A.R.S. § 13-541), should be construed to encompass an "unlawful arrest."  570 P.2d at 1288.  Thus, *Snodgrass* sheds little light on how to interpret a differently worded phrase ("acting under color of his official authority") that appears in A.R.S. § 13-2402(A)(1).  This is particularly true where other Arizona decisions clarify that executing a search warrant falls within the scope of an officer's official duties, irrespective of the warrant's legality.  *Clary*, 2 P.3d at 1258.[4]

At bottom, A.R.S. § 13-2402(A)(1) only requires that an individual interfere with the execution of an act taken "under color of . . . official authority."  A peace officer executing a search warrant is acting "under color of . . . official authority" regardless of the warrant's ultimate legality.  Nowhere does the statute require a finding that a public servant was acting lawfully.  As a result, success on Manriquez's illegal search claim wouldn't necessarily imply the invalidity of his conviction.

III.   Qualified Immunity

"When an officer asserts qualified immunity as a defense, . . . [courts] first ask whether the facts taken in the light most favorable to the plaintiff show that the officer's conduct violated a constitutional right.  If so, [courts] then ask whether the right in question was clearly established at the time of the officer's actions, such that any reasonably well-

---

[4]      The Court acknowledges there is some tension between *Hatton* and *Snodgrass*. Whatever the conflict, *Hatton*, an Arizona Supreme Court case, controls over *Snodgrass*, which was decided by the Arizona Court of Appeals.  Importantly, *Hatton* rejected the rule articulated in *People v. Curtis*, 450 P.2d 33 (Cal. 1969).  *Hatton*, 568 P.3d at 1046. *Snodgrass* relied on *Curtis*.

trained officer would have known that his conduct was unlawful." *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020) (citation omitted).  For purposes of the second step's "clearly established" inquiry, although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citation omitted).  In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).  *See also Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (quotation omitted).

"Once the defense of qualified immunity is raised by the defendant, the plaintiff bears the burden of showing that the rights allegedly violated were 'clearly established.'" *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1157 (9th Cir. 2000).  *See also Romero v. Kitsap Cty.*, 931 F.2d 624, 627 (9th Cir. 1991) ("The plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (citation omitted).[5]  Although it "is often beneficial" to begin the qualified-immunity analysis by addressing whether a statutory or constitutional right has been violated, district courts are vested with discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  *See also Orn*, 949 F.3d at 1174

---

[5]      Although *LSO* and *Romero* place the burden on the plaintiff, other Ninth Circuit opinions hold that "[q]ualified immunity is an affirmative defense that the government has the burden of pleading and proving." *Frudden v. Pilling*, 877 F.3d 821, 831 (9th Cir. 2017). These opinions are difficult to reconcile.  *See generally Slater v. Deasey*, 943 F.3d 898, 909 (9th Cir. 2019) (Collins, J., dissenting from denial of rehearing en banc) ("The panel committed . . . error in suggesting that Defendants bear the burden of proof on the disputed qualified-immunity issues presented in this appeal. . . .   [T]he applicable—and well-settled—rule [in the Ninth Circuit] is that '[t]he plaintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.'") (citation and emphases omitted).

("We have the discretion to skip the first step in certain circumstances, as when the officer is plainly entitled to prevail at the second step.").  The Supreme Court has recognized that starting with the second prong may be particularly appropriate when addressing the first prong would require a district court to construe "uncertain" or "ambiguous" state law. *Pearson,* 555 U.S. at 238.

A.     **Excessive Force**

When the defense of qualified immunity is raised in a § 1983 action involving a claim of excessive force, the first prong of the qualified-immunity analysis requires an assessment of whether the force used was "objectively reasonable," which "is determined by an assessment of the totality of the circumstances."  *Green v. City & Cty. of San Francisco*, 751 F.3d 1039, 1049 (9th Cir. 2014).  "Because this inquiry is inherently fact specific, the determination of whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases."  *Id.* (quotation omitted).  Meanwhile, the second prong of the qualified-immunity analysis in excessive force cases "requires two separate determinations: (1) whether the law governing the conduct as issue was clearly established and (2) whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law." *Id.* at 1052.  This is generally a question of law, but genuine issues of material fact, such as how much force was used, may defeat a claim of qualified immunity at the summary judgment stage.  *Id.*

Manriquez largely ignores these standards in his briefing.  When addressing the adequacy of Count I, Manriquez focuses almost entirely on whether the amount of force Defendants used during the encounter in August 2016 was reasonable.  (Doc. 68 at 14-16.) This discussion may be relevant to prong one of the qualified-immunity analysis, but it fails to address prong two—whether the case law in existence as of August 2016 was "developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."  *Shafer,* 868 F.3d at 1117.  Manriquez makes no attempt whatsoever to

1   identify an earlier case, with similar facts, in which a law enforcement officer's use of force
2   was deemed excessive.

3          A related difficulty with Manriquez's approach is that he asks the Court to assume,
4   for purposes of evaluating the reasonableness of Defendants' conduct, that "he presented
5   little to no physical threat to [Defendants]" and that he simply "pulled his hand back when
6   Lawrence tried to grab him[,] which [Defendants] viewed as the 'green light' to administer
7   a beating."  (Doc. 68 at 15.)  These factual assertions are foreclosed by *Heck*.  As discussed
8   in Part II.A above, Manriquez's conviction under A.R.S. § 13-2402(A)(1) necessarily
9   means that Manriquez "us[ed] or threaten[ed] to use violence or physical force" against
10  Defendants as they attempted to execute the search warrant.  *Id.*  Although *Heck* does not
11  categorically foreclose Manriquez from asserting an excessive force claim arising from the
12  August 2016 encounter, it does foreclose him from arguing that he never used, or
13  threatened to use, violence or physical force during that encounter.

14         Given this backdrop, Defendants are entitled to summary judgment on the bulk of
15  Manriquez's excessive force claim.  Manriquez has not even attempted to demonstrate that
16  it was clearly established, in August 2016, that it is unconstitutional for officers who are
17  executing a search warrant, and who encounter an occupant who uses (or threatens to use)
18  violence and physical force against them while in the doorway of the premises, to take the
19  occupant to the ground, restrain his legs, and use a taser and fist strikes against him until
20  he can be handcuffed and subdued.  Nor has the Court identified any cases, through its own
21  research, imposing liability on similar facts.  Summary judgment is warranted under these
22  circumstances.  *Cf. Cruz v. Kauai Cty.*, 279 F.3d 1064, 1069 (9th Cir. 2002) (holding that
23  plaintiff had "not met his burden of proving that the right allegedly violated here was
24  'clearly established'" because "[u]nfortunately for [plaintiff], he has not cited any case that
25  establishes such a right, nor is it self-evident").

26         This does not, however, end the analysis.  One component of Manriquez's excessive
27  force claim is that Lawrence continued to use force against him after he stopped resisting.
28  Specifically, Manriquez claims that, after he stopped resisting, "Lawrence . . . punched him

in the face one more time for good measure," and then, after he was handcuffed, "Lawrence picked him up off the floor by the handcuffs, wrenching Manriquez's shoulders." (Doc. 68 at 16; Doc. 68-5 at 67-69, 72-75.)

It is well established that "continued use of force against a suspect who has been brought to the ground can violate the Fourth Amendment." *Zion v. Cty. of Orange*, 874 F.3d 1072, 1077 (9th Cir. 2017).[6] *See also Rodriguez v. City of West Covina*, 2018 WL 6252487, *5 (C.D. Cal. 2018) ("[A]n officer's use of force against a suspect who no longer poses an immediate threat can violate the Fourth Amendment."); *Castillo v. City of Tempe*, 2014 WL 11505911, *5 (D. Ariz. 2014) ("[O]nly an incompetent officer would fail to realize that using closed-fists to punch Plaintiff's face, even after Plaintiff is handcuffed, until he is knocked unconscious and bleeding from the eyes, violates Plaintiff's Fourth Amendment rights."). It is also well established that the "rough and abusive" use of handcuffs is a Fourth Amendment violation. *Hansen v. Black*, 885 F.2d 642, 645 (9th Cir. 1989). *Compare Johnson v. Rodriguez*, 2014 WL 7338852, *5-7 (E.D. Cal. 2014) (officer not entitled to qualified immunity, where plaintiff presented evidence that the officer "applied pressure on his handcuffed hands for four to six minutes by lifting his hands up which caused excruciating pain for Plaintiff," because "[u]nder these circumstances, no reasonable officer could believe that the abusive application of handcuffs was constitutional"), *with Luchtel v. Hagemann*, 623 F.3d 975, 982 (9th Cir. 2010) (affirming grant of qualified immunity on excessive force claim where "[t]here is no claim or testimony that [the officers] wrenched her arms up or gratuitously intensified pain in the handcuffing process"). There's simply no justification for punching an individual who is no longer resisting, nor is there any need to wrench the individual's handcuffed arms in a cruel, pain-inducing manner. *Cf. Sanford*, 258 F.3d at 1119 (stating that an unnecessary punch to the face could give rise to an excessive force claim). Indeed, according to

---

[6]   Although *Zion* was decided in 2017, a year after the incident at issue here, the *Zion* court stated that the rule against continued use of force after an individual has stopped resisting was clearly established by two Ninth Circuit opinions that predate August 2016. 874 F.3d at 1076 (citing *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003), and *Davis v. City of Las Vegas*, 478 F.3d 1048 (9th Cir. 2007)).

1  Manriquez, other officers repeatedly instructed Lawrence to stop as they witnessed the
2  alleged abuse.  (Doc. 68-5 at 67, 69.)

3       Thus, "[e]xamining the facts here at issue in the light most favorable to" Manriquez,
4  Lawrence is not entitled to qualified immunity for his alleged conduct after Manriquez
5  stopped resisting.  *Davis v. City of Las Vegas*, 478 F.3d 1048, 1057 (9th Cir. 2007).
6  Manriquez has proffered evidence that, if believed by the jury, would establish that
7  Lawrence's use of force after Manriquez stopped resisting was objectively unreasonable
8  (and thus violative of the Fourth Amendment), *Heck* does not foreclose Manriquez from
9  proffering that evidence (because it doesn't deny that Manriquez initially used or
10  threatened to use force or violence), and it was clearly established in August 2016 that it is
11  unconstitutional to punch a non-resisting, handcuffed person in the face or gratuitously
12  wrench such a person's arms.

13       B.    **Illegal Search**

14       Manriquez's primary argument with respect to Count II is that Defendants' search
15  of his home was illegal because the warrant on which they relied failed to identify his home
16  as the place to be searched, rendering it "facially invalid."  (Doc. 68 at 13-14.)[7]

17       In the context of the execution of a search warrant, the qualified immunity analysis
18  turns on (1) whether the warrant was valid and (2) if not, whether an officer nevertheless
19  acted in objective good faith in relying on the warrant.  *Ramirez v. Butte-Silverbow Cty.*,
20  298 F.3d 1022, 1025-28 (9th Cir. 2002).  Put another way, "[a] police officer may be
21  entitled to qualified immunity even for a search and arrest based on invalid warrants if he
22  has a 'reasonable belief that the warrant was supported by probable cause.'"  *Armstrong v.*
23  *Asselin*, 734 F.3d 984, 991 (9th Cir. 2013) (quoting *Messerschmidt v. Millender*, 565 U.S.

24

---

25  [7]      Manriquez also contends the search was illegal because (1) the affidavit Ensley
   proffered to secure the warrant lacked "necessary and relevant information, like names,
26  dates, and times related to" the alleged drug activity and thus "failed to include any specific
   factual information necessary to establish probable cause" (Doc. 68 at 14) and (2) Ensley
27  "misled the Justice of the Peace . . . to obtain his approval to purportedly amend
   the . . . search warrant in order to search" Manriquez's home (Doc. 1 ¶ 99).  The Court
28  need not address these claims given its conclusion that Manriquez's claim against Ensley
   in Count II survives summary judgment for other reasons.

535, 555 (2012)).  It is generally reasonable for an officer to believe a warrant is valid if the warrant was approved by a neutral magistrate judge and is free from obvious error.  *Id.* at 991-92 ("[W]here the search or seizure is executed pursuant to a warrant, the fact that a neutral magistrate issued the warrant is the clearest indication that the officers acted in an objectively reasonable manner.  The warrant confers a 'shield of immunity' lost only in 'rare' circumstances, even for mistakenly issued warrants.") (citations and internal quotation marks omitted).

Here, the first part of the analysis is straightforward.  The warrant used to search Manriquez's home was invalid to search that location.  The Fourth Amendment provides in relevant part that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing the place to be searched,* and the persons or things to be seized." *Id.* (emphasis added).  *See also* A.R.S. § 13-3913 ("No search warrant shall be issued except on probable cause, supported by affidavit, naming or describing the person and particularly describing the property to be seized and the place to be searched."). It necessarily follows that a search warrant must identify the specific location to be searched.  *See, e.g., United States v. Leon*, 468 U.S. 897, 923 (1984) ("[A] warrant may be so facially deficient—*i.e.,* in *failing to particularize the place to be searched* or the things to be seized—that the executing officers cannot reasonably presume it to be valid.") (emphasis added).   "As to a warrant's description of the place to be searched, . . . [i]t is enough if the description is such that the officer with a search warrant can, with reasonable effort, ascertain and identify the place intended."  *United States v. Brobst*, 558 F.3d 982, 991-92 (9th Cir. 2009) (quotation omitted).  Technical errors in the description, such as in an incorrect address, are not necessarily fatal to a search warrant so long as the rest of the description particularly describes the place to be searched.  *See, e.g.*, *United States v. Turner*, 770 F.2d 1508, 1511 (9th Cir. 1985).

The warrant in this case identified Room #1 at the Copper Mountain Motel as the place to be searched.  (Doc. 76-1 at 45-46.)  It is difficult to understand how such a warrant could be construed as authorizing a search at an entirely difficult location—Manriquez's

home located at 711 W. Sonora.  *Cf. Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (holding that a warrant that "provided no description of the type of evidence sought" failed to meet the requirements of the Fourth Amendment and was "plainly invalid").  Defendants have not cited any case, from any jurisdiction, holding that a warrant authorizing a search at one location may be used to search a different location so long as one officer obtains verbal authorization, which is not memorialized in the warrant itself, from the issuing judge.  This is not surprising, because such an approach would undermine one of the basic purposes of the Fourth Amendment's particularity requirement, which is "to inform the person subject to the search" where the executing officers are entitled to search.  *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986).  *See also Groh*, 540 U.S. at 561 ("[One] purpose of the particularity requirement . . . [is to] assure[] the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search.") (quotation omitted).

Notwithstanding all of this, Defendants offer several reasons why the warrant should be considered valid.  First, Defendants argue that, under *Heck*, "this Court must accept that the search authorization lawfully placed them at the residence to make contact with Plaintiff, detain him, and conduct a search."  (Doc. 65 at 8-9.)  But as discussed in Part II.B above, Manriquez's conviction under A.R.S. § 13-2402(A)(1) doesn't necessarily show that Defendants were operating lawfully—it merely shows that Defendants were acting under color of official authority.

Next, Defendants identify several reasons why there was probable cause to believe drug-related evidence would be found at 711 W. Sonora, including that "[f]or search warrants issued in connection with drug trafficking cases, . . . courts recognize that drug trafficking is an ongoing enterprise that often results in the use of different locations" and that because drug-related evidence was found at the motel, "[i]t was entirely reasonable to think a bigger stash was likely stored nearby at the 711 West Sonora residence, an address already noted in the original search warrant documents."  (Doc. 65 at 9-12.)  But the issue here isn't whether Defendants could have secured a valid warrant to search 711 W.

Sonora—the issue is whether the warrant they actually used to search 711 W. Sonora, which only authorized the search of a different location, could be validly used for that purpose. It couldn't.

Defendants also contend that "verbal warrant amendments do not automatically violate constitutional principles." (Doc. 65 at 11.) There are several problems with this argument. First, the only case Defendants cite in support of their claim that "verbal warrant amendments" are permissible is *United States v. Smith*, 77 M.J. 631 (Army Ct. Crim. App 2018). But the facts of *Smith* are much different from the facts of this case. There, although a military magistrate judge did authorize a "verbal warrant amendment" of sorts—the judge verbally authorized a military investigator to seize "any electronic devices" located within Smith's home, even though the original warrant affidavit sought permission to seize a more circumscribed subset of electronic devices ("Apple brand digital devices") located within Smith's home—investigators subsequently applied for, and obtained, a second warrant that authorized the search of all of the seized devices. *Id.* at 633-34. Moreover, during the suppression hearing, Smith didn't raise any challenges pertaining to the initial verbal warrant amendment, leading the Army Court of Criminal Appeals to deem that challenge forfeited when Smith attempted to raise it for the first time on appeal. *Id.* at 635.

Second, putting aside these factual differences, a 2018 decision from the Army Court of Criminal Appeals sheds little light on the status of the clearly established law applicable in the Ninth Circuit in 2016. *See generally Sharp v. Cty. of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("The prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction."). Ninth Circuit and Supreme Court decisions that predate the August 2016 incident in this case establish, quite clearly, that a search warrant must identify, with particularity, the location to be searched. For example, in 1984, the Supreme Court held in *Leon* that a search warrant that "fail[ed] to particularize the place to be searched" would be *"so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."* 468 U.S. at 923. And in 2002, the Ninth Circuit stated in *Ramirez*

that "the warrant must contain all authorizations and limitations in writing" and that the "only way" to "remed[y] the defect in the warrant was to ask a magistrate to issue a corrected version."  298 F.3d at 1026-27.[8]

Third, even assuming for the sake of argument that Ensley could have obtained verbal authorization from the justice of the peace to amend the warrant (which *Ramirez* seems to foreclose), the warrant that resulted from the amendment process in this case still didn't identify 711 W. Sonora as a location that could be searched.  On this point, the decision in *United States v. Kurt*, 986 F.2d 309 (9th Cir. 1993), which was not cited by the parties, is instructive.  There, "[o]fficers obtained . . . a warrant to search for a murder weapon at Kurt's residence" but when they "arrived at the address on the warrant, they found it to be the address of Kurt's parents.  The parents gave them the correct address." *Id.* at 310.  The search warrant affiant, in turn, placed a telephone call to "another Snohomish County superior court judge," who "authorized the change to the warrant" without placing the affiant under oath.  *Id.*  Critically, and unlike in this case, the officer then "alter[ed] the address on [the] search warrant" before executing it.  *Id.*  Given those facts, the Ninth Circuit denied the resulting motion to suppress (which was premised solely on the second judge's failure to place the affiant under oath), holding that the good-faith exception applied.  *Id.* at 311.[9]

---

[8]     These statements from *Ramirez* are not dicta (which is how they were incorrectly characterized in the tentative ruling).  This is because they were reasoned and germane to the *Ramirez* court's ultimate determination that a Fourth Amendment violation had occurred.  *United States v. McAdory*, 935 F.3d 838, 843 (9th Cir. 2019) ("Where a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense. . . .  In other words, well-reasoned dicta is the law of the circuit . . . .") (citations, brackets, and internal quotation marks omitted).

[9]     Similarly, in *United States v. Skarda*, 2014 WL 4699883 (D.N.D. 2014), an FBI agent obtained a warrant to search a particular address that he believed to be the subject's home address but then determined, before executing the warrant, that the subject actually lived at a different address in the same town.  *Id.* at *1-2.  As a result, the FBI agent placed a telephone call to the magistrate judge who issued the warrant to explain "that the address on the search warrant application and search warrant was incorrect."  *Id.* at *2.  The judge, in turn, "verbally authorized [the FBI agent] to change the address on the warrant."  *Id.*  As in *Kurt*, and unlike here, the agent then manually handwrote the change onto the warrant: "[The FBI agent] made the changes in his own handwriting and initialed those changes."  *Id.*  Thus, at the time of execution, the warrant identified, with particularity, the place to be

- 22 -

Had Defendants made the same sort of handwritten changes to the search warrant that were made in *Kurt*, it's possible the analysis concerning the validity of the warrant might be different (although *Ramirez*, again, suggests such a warrant would remain defective). But because they instead chose to search Manriquez's home in reliance on a warrant that did not even mention Manriquez's address, they cannot contend the warrant satisfied the Fourth Amendment's particularity requirement. This approach failed to provide Manriquez with "the required information" as to the authorized location of the search, which is a basic Fourth Amendment requirement. *Ramirez¸* 298 F.3d at 1026.[10]

The second prong of the qualified-immunity analysis in search warrant cases addresses whether the executing officer "acted in objective good faith" when relying on the warrant. *Id.* at 1025-28. In their moving papers, Defendants argue they are entitled to qualified immunity because (1) "the fact that a neutral magistrate . . . issued [the] warrant is the clearest indication that the officers acted in an objectively reasonable manner" (Doc. 65 at 11-12) and (2) Manriquez has failed to identify any cases showing that "the verbal transfer of the search warrant authorization from the motel to 711 W. Sonora . . . under these particular circumstances . . . violates clearly established law" (Doc. 73 at 9). Additionally, during oral argument, Defendants argued they are entitled to qualified immunity because the original search warrant affidavit (Doc. 76-1 at 42) identified 711 W. Sonora as Soriano's primary residence—and, thus, they weren't relying solely on a verbal warrant amendment.

These arguments are unavailing. As for the first point, although the justice of the

---

searched. *Id.* Given those circumstances, the district court denied the resulting motion to suppress, holding that "[t]here is no evidence in the record to suggest that [the FBI agent] failed to act in good faith, and he objectively and reasonably relied on the warrant approved by [the magistrate judge]." *Id.* at *5.

[10]   Manriquez argues that the justice of the peace's suppression order is, alone, sufficient to demonstrate the invalidity of the warrant. (Doc. 68 at 13-14.) The justice of the peace's order is, unfortunately, devoid of analysis, so the Court is unable to draw any conclusions as to why the justice of the peace ordered suppression. (Doc. 68-8 at 2-3.) Also, even assuming the suppression order was premised on the invalidity of the warrant, Manriquez fails to explain why it should carry preclusive effect here. In any event, for the reasons discussed above, the Court agrees with Manriquez's overarching point that the warrant was invalid.

peace verbally authorized Ensley to amend the warrant to include 711 W. Sonora, the justice of the peace didn't go further and assure Ensley that it would be permissible to search 711 W. Sonora without notating the change on the warrant itself.  (Doc. 68-7 at 32-33.)  To the contrary, Ensley asked during the phone call "Do we have your permission to amend the search warrant?", the justice of the peace responded by saying "Yeah, go ahead and amend it," and Ensley then verified that "[w]e're going to amend the search warrant." (*Id.*)  Because Ensley did not follow through with that assurance, Defendants cannot argue they relied in good faith on the approval provided by the justice of the peace.[11]

As for the second point, although Manriquez hasn't identified a prior case imposing liability under the exact same factual circumstances, there need not be a "case directly on point" so long as "existing precedent . . . placed the . . . constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.  As discussed above, there are an array of Ninth Circuit and Supreme Court cases from before August 2016 that establish the illegality of relying on a search warrant that fails to identify, with particularity, the location to be searched. *See, e.g., Leon*, 468 U.S. at 923; *Ramirez*, 298 F.3d at 1026-27.  Alternatively, even if those decisions might be said to define the constitutional principle at an excessively "high level of generality," *Kisela*, 138 S. Ct. at 1152, the Supreme Court has also recognized "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstance." *District of Columbia v. Wesby*, 138 S.Ct. 577, 590 (2018) (citation omitted).  *See also United States v. Lanier*, 520 U.S. 259, 271 (1997) ("[I]n [some] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not]

---

[11]  This case is therefore distinguishable from the typical search warrant fact pattern, where a magistrate judge determines that the facts provided in the search warrant affidavit are sufficient to establish probable cause, a reviewing court later disagrees as to the sufficiency of those facts, and the question for qualified-immunity purposes is whether the executing agent was nevertheless justified in relying on the magistrate judge's initial determination of sufficiency.  *See, e.g., Armstrong*, 734 F.3d at 993 ("Once a neutral magistrate approves of the search or seizure, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient.") (quotation omitted).

previously been held unlawful. . . .  The easiest cases don't even arise.")  (citations and internal quotation marks omitted).  In the Court's view, it is painfully obvious that a warrant authorizing a search at one location can't be used to conduct a search at an entirely different location.  This is not a case where an officer stands accused of violating a constitutional standard that has some play in the joints, such as whether "probable cause" existed to support a search or whether the level of force used by the officer was "reasonable."  The Fourth Amendment states, in plain and unambiguous terms, that "no Warrant[] shall issue" unless the warrant "particularly describ[es] the place to be searched."  The warrant here did not come close to satisfying that basic requirement.  And "[g]iven that the particularity requirement is set forth in the text of the Constitution, no reasonable officer could believe that a warrant that plainly did not comply with that requirement was valid."  *Groh¸* 540 U.S. at 563-64.

As for the third point, the problem with Defendants' argument is that the affidavit wasn't attached to the warrant or properly incorporated into the warrant.  Under well-established Ninth Circuit law, a law enforcement officer can't rely on an affidavit in these circumstances to cure a warrant deficiency.  *See, e.g., United States v. McGrew*, 122 F.3d 847, 850 n.5 (9th Cir. 1997) ("The agents must either serve the affidavit with the warrant or list with particularity its relevant directives on the warrant itself.  Otherwise, the good faith exception is not available because (1) the requirement of attaching affidavits to general warrants has been the clear law of this circuit for over a decade, foreclosing any 'reasonable belief' to the contrary; and (2) no matter how aware the officers are of the limits of their search, the person being searched (the second aim of the rule) is still completely unaided when agents fail to produce a document explaining the parameters of the search.").

For these reasons, the Court rejects Defendants' blanket contention that *all* of them are entitled to qualified immunity with respect to Count II.  But Defendants also make an alternative argument—they contend that each Defendant is "entitled to an individualized assessment of [his] alleged conduct . . . in relation to the search."  (Doc. 65 at 8.)  In

response, Manriquez largely fails to provide such an individualized assessment. In the factual section of his brief, Manriquez provides little information concerning each Defendant's specific role in obtaining the warrant, other than to note that Ensley was the leader and that Lawrence assisted Ensley during the follow-up call to the justice of the peace. (Doc. 68 at 4-10.) In fact, Manriquez sometimes lumps all four Defendants together without differentiation. (*Id.* ["The officers decided to get a telephonic warrant."].) Similarly, in the argument section of his brief addressing Count II, Manriquez refers to "Defendants" as an undefined group, apart from a few references to Ensley's specific conduct. (*Id.* at 13-14.)

Under Ninth Circuit law, only those officers who "plan and lead a search" are required to "actually read the warrant and satisfy themselves that they understand its scope and limitations." *Ramirez*, 298 F.3d at 1027. Line officers "are required to do much less" and are protected by qualified immunity if they rely on their leaders' representations about the validity of the warrant. *Id.* at 1028. Given these standards, Manriquez has failed to meet his burden of proof with respect to Doran and Mueller—he has failed to establish their role went beyond simply participating in a search led by others. *Id.* ("It is possible that Groh shared authority over the search with other officers, such as Sheriff McPherson and Undersheriff Lee. However, nothing in the record indicates this was the case. Therefore, all officers except Groh are protected by qualified immunity."). In contrast, the evidence proffered by Manriquez, when viewed in the light most favorable to him, suggests that Ensley planned and led the search and that Lawrence shared in that leadership role. (Doc. 72 [video exhibit of Lawrence explaining to Ensley what to include in affidavit for amended warrant].) Accordingly, Ensley and Lawrence are not entitled to qualified immunity on Count II.

IV. <u>Necessity Of A Causation Expert</u>

Defendants assert that Manriquez was required to disclose a medical expert to explain causation as it relates to his purported shoulder injury and that Manriquez's disclosures with respect to his treating physicians fail to provide any information on that

topic.  (Doc. 65 at 16-18.)  Thus, Defendants argue that Manriquez's claim for damages must be limited "to those superficial bruises, contusions, or lacerations that became visible immediately after the law enforcement action."  (*Id.* at 18.)  Manriquez responds that an expert isn't necessary to prove causation because "previously disclosed MRI reports" show "Manriquez has a significant shoulder injury."  (Doc. 68 at 16-17.)

"In a § 1983 action, the plaintiff must . . . demonstrate that the defendant's conduct was the actionable cause of the claimed injury."  *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).  This requires that "the plaintiff . . . establish both causation-in-fact and proximate causation."  *Id.*

As an initial matter, Defendants base their argument on Arizona law.  (Doc. 65 at 16-18.)  It is unclear whether Arizona law governs causation in a § 1983 action.  The Ninth Circuit has referred to "general tort principles" in determining causation for § 1983 claims.  *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019).  *See also Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009) (analyzing causation with reference to "basic tort principles"); *Galen v. Cty. of Los Angeles*, 477 F.3d 652, 663 (9th Cir. 2007) (analyzing causation with reference to "traditional tort principles" and citing the Restatement (Second) of Torts).  *Cf. Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981) (referring to Prosser, Law of Torts in analyzing causation requirement of § 1983).  That said, "[i]t is uniformly held that where injuries complained of are of such a character as to require skilled and professional persons to determine the cause and extent thereof, they must be proved by the testimony of medical experts."  *Franklin v. Skelton*, 250 F.2d 92, 97 (10th Cir. 1957).  Further, federal courts sometimes refer to "state law tort principles" in "applying basic tort principles" to § 1983 claims.  *Rodriguez-Cirilo v. Garcia*, 115 F.3d 50, 52 (1st Cir. 1997).

In general, "[i]t is the function of the jury to determine, in any case in which it may reasonably differ on the issue, whether the defendant's conduct has been a substantial factor in causing the harm to the plaintiff."  Restatement (Second) of Torts § 434(2).  But it is the Court's role, in the first instance, to determine "whether the evidence as to the facts

makes an issue upon which the jury may reasonably differ." Restatement § 434(1)(a). *Cf. Baum-Holland v. Hilton El Con Mgmt., LLC*, 964 F.3d 77, 93 (1st Cir. 2020). Further, because a § 1983 plaintiff bears the burden of showing that it is more likely than not that a defendant's actions caused the alleged harm, "[a] mere possibility of such causation is not enough; and when the matter remains one of pure speculation and conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." Restatement § 433B cmt. a. *Cf. Baum-Holland*, 964 F.3d at 93 (quoting the Restatement and indicating that "summary judgment is appropriate" when a plaintiff produces inadequate causation evidence). In other words, "there must be a sufficient showing . . . that *a* causal relation existed" and "[w]here the conclusion of causation is not within common knowledge, expert testimony may provide a basis for it, but in the absence of such testimony it may not be drawn." *Moody v. Maine Cent. R. Co.*, 823 F.2d 693, 695 (1st Cir. 1987) (quoting Prosser & Keeton on Torts, 269 (5th ed. 1984)) (cited with approval in *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 503-504 (9th Cir. 1994)).

In light of these standards, Manriquez will not be allowed, at trial, to argue that Defendants' conduct caused him to suffer a torn labrum or other long-term shoulder damage or to introduce his MRI report in an attempt to corroborate the existence of such injuries. The report relates to an MRI taken 16 months after Manriquez's encounter with Defendants. (Doc. 68 at 17.) It lists a variety of damage to Manriquez's shoulder, including "mild to moderate degenerative changes" to the joint, a "full-thickness tear of the supraspinatus tendon," a "thin linear SLAP tear within the superior labrum," and a dislocated brachii tendon. (Doc. 68-8 at 35.) Completely absent from the report is any indication of what caused any of this damage. Moreover, Manriquez has suffered from shoulder pain for years, predating the August 2016 encounter with Defendants. (Doc. 76-2 at 44.) He previously attributed this pain to an injury he sustained in high school. (*Id.*) Given this backdrop, and in light of Manriquez's failure to properly disclose any medical witnesses who might tie the shoulder damage reflected in the MRI to Manriquez's encounter with Defendants, it would be "mere speculation" for a juror to conclude this

damage was caused by the encounter.

Defendants overreach, however, by arguing that Manriquez's evidentiary failures mean his claim for damages must be limited "to those superficial bruises, contusions, or lacerations that became visible immediately after the law enforcement action." (Doc. 65 at 18.) Although Manriquez can't present any evidence or argument that he suffered long-term shoulder damage as a result of the encounter, he remains free to argue that he experienced pain and suffering in his shoulder during and in the aftermath of the encounter (which, again, allegedly involved Lawrence wrenching Manriquez's handcuffed arms in a painful manner). The existence of such pain and suffering need not be corroborated by expert testimony.

Accordingly, **IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 65) is **granted in part and denied in part**, as follows:

(1)     Defendants' motion for summary judgment as to Count I (excessive force) is **granted** as to Ensley, Mueller, and Doran. As for Lawrence, it is granted in part (as to Lawrence's conduct up to the point when Manriquez contends he stopped resisting) and denied in part (as to Lawrence's conduct afterward).

(2)     Defendants' motion for summary judgment as to Count II (illegal search) is **granted** as to Mueller and Doran and **denied** as to Ensley and Lawrence.

(3)     Defendants' motion for summary judgment as to causation of Manriquez's shoulder injury is **granted in part**. Manriquez may not present any evidence or argument that he suffered long-term shoulder damage as a result of the encounter, but he remains free to argue that he experienced pain and suffering in his shoulder during and in the aftermath of the encounter.

Dated this 16th day of September, 2020.

Dominic W. Lanza
United States District Judge